# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs October 27, 2021

## STATE OF TENNESSEE v. DASHUN SHACKLEFORD

**Appeal from the Criminal Court for Knox County**
**No. 109937   Steven Wayne Sword, Judge**

_____

**No. E2020-01712-CCA-R3-CD**

_____

The Defendant-Appellant, Dashun Shackleford, was convicted by a Knox County Criminal Court jury as charged in a twenty-count indictment; four alternative counts each of aggravated robbery against four victims and four corresponding counts of criminal gang offense enhancement. The trial court merged the aggravated robbery convictions into four counts and imposed a total effective sentence of twenty years' incarceration to be served at 85 percent. On appeal, the Defendant argues that (1) the evidence is insufficient to support his gang enhancement convictions; and (2) the gang enhancement counts violate his constitutional rights to due process and expressive association. Upon our review, we conclude that the State failed to sufficiently prove the gang enhancement counts and failed to comply with the notice requirements mandated by Tennessee Code Annotated § 40-35-121(g). Accordingly, we reverse and vacate the judgments in Counts 13 through 16, and remand for resentencing as to those counts. Because the gang enhancements are no longer applicable to the Defendant's case, we decline to address the constitutional questions raised in this appeal.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of Criminal Court Reversed and Vacated in Part; Remanded for Resentencing

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and JILL BARTEE AYERS, JJ., joined.

Clinton E. Frazier, Maryville, Tennessee, for the Defendant-Appellant, Dashun Shackleford.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald and Philip H. Morton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

On September 24, 2016, the seventeen-year-old Defendant and another man, fifteen-year-old Jalon Copeland, robbed four teenage boys at gunpoint while they were playing basketball. Following the robbery, the mother of one of the boys called the police. The Defendant and Copeland were arrested the next day when one of the boys saw the same car they were driving parked on his street. At trial, the Defendant did not dispute that the victims in this case were robbed at gunpoint. He contested identification and denied that he was the one who perpetrated the offense.

The Defendant's trifurcated trial began on June 25, 2018. At trial, Tijuan Lamar Willis testified that he was nineteen years old at the time of trial. He stated that at the time of the robbery, he was a senior at West High School in Mechanicsville. Willis testified that he was playing basketball at a neighborhood park with his friends Douglas Crosby III, Jacquese Clark, and Damarius Parker on September 24, 2016. Willis, Crosby, and Parker played basketball while Clark watched from a bench. A gold car was parked near the court. Approximately thirty minutes after their arrival, Clark noticed a second car pull up, and the driver got out of the car and talked to the Defendant prior to the robbery. Willis saw the Defendant exit the gold car and walk down to where they were playing basketball. The Defendant then "threw something away, and then turned around, pulled his gun out, pointed it at [Crosby]'s legs and then his head, and then told him to empty everything." Willis testified that the Defendant and another guy, later determined to be Copeland, "took everything" and explained that he and his friends "didn't want to lose [their] live[s] over not giving them what they wanted. So [they] just gave it to them." Willis stated that the car that Clark noticed was gold, and the Defendant was in the driver's seat.

Willis reiterated that the Defendant pointed his gun at Crosby's legs and head. He did not remember whether Copeland also had a gun. Following the robbery, the Defendant and Copeland got back into the gold sedan, with the Defendant again in the driver's seat. The group then witnessed the Defendant and Copeland drop Crosby's and Willis' emptied backpacks outside a church. The group went back to Clark's home and informed his mother what happened, who subsequently called the police. Willis testified that the next day, he saw the same gold sedan parked outside of "Nookie's house[.]" Willis saw the Defendant, wearing the same clothes as during the robbery, sitting on the porch of the house and called police. Willis watched police arrive and take the Defendant into custody. Willis testified that during the robbery, Parker's speaker was stolen, Crosby's shoes were stolen, and Parker's, Clark's, and Crosby's phones were stolen. Willis did not recover any of his stolen property following the robbery. Photographs of the gold sedan and Nookie's house were received as exhibits. Willis did not know the Defendant prior to the robbery and identified the Defendant at trial as the perpetrator of the offense.

On cross-examination, Willis clarified that following the robbery, the Defendant, Copeland, and the other occupants of the car all climbed back into the gold sedan. Willis testified that he did not recall if anyone other than the Defendant possessed a gun during the robbery. He affirmed that he did not recognize the Defendant, Copeland, or the other occupants of the car during the robbery. Willis reiterated that he saw the gold sedan parked at a house near his home the next day, and the Defendant was on the house's porch wearing the same clothing as the day before. On redirect examination, Willis affirmed that there was no "doubt in [his] mind" that the Defendant was the man who robbed him on September 24, 2016. Upon questioning by the court, Willis clarified that the Defendant stole his things from the bench by the basketball court because he did not have anything on his person while playing basketball.

Douglas Crosby III testified that he was a junior in high school on September 24, 2016. Crosby agreed that he did not know the Defendant or Copeland prior to the robbery. On the day of the robbery, Crosby and his friends "put all [their] stuff down" on the bench by the basketball court before playing basketball. Crosby explained that Clark was sitting on the bench watching them play when "he heard people laughing and talking . . . and pointing at him" and asked the people if they were "plotting on [him.]" The Defendant told Clark that he was not and "just laughed." The Defendant then "came down the hill" and was "throwing a bottle away . . . and when he threw it away, grabbed a gun, turned around, pulled out the gun," and told the group of friends to "give them everything." Crosby testified that he and his friends told the Defendant and Copeland where "all [their] stuff" was located. Crosby explained that the group usually played basketball at a church near his home, but the church was closed on the night of the robbery, forcing the group to play basketball at the outdoor court instead. Crosby testified that the property he put on the bench included his backpack containing his "hooping stuff and [his Air Jordan] shoes." Crosby gave the Defendant his phone and wallet from his pocket when the Defendant pointed the gun at him. Parker had "a speaker and his phone" sitting on the bench.

Crosby testified that he was not paying attention to the gold sedan until Clark started yelling towards its occupants. Crosby specifically remembered the Defendant because he was the driver of the gold sedan and "the one that came down there first[.]" The Defendant was approximately "three or four feet" away from Crosby when he pointed the gun at him and demanded his things. Crosby described the Defendant's gun as "silver and black." After the Defendant took everyone's bags and other property, the Defendant got back into the driver's seat of the gold sedan. There was "another person," Copeland, who was "checking everyone too" to make sure they had given all of their things to the Defendant, and the other occupants of the car stayed near where it was parked. Crosby described Copeland's role in the robbery as "a backup dude" who was also pointing a gun at Crosby and his friends. Following the robbery, Copeland got into the backseat of the gold sedan. Crosby ran shoeless to his home, but when no one was home, he and his friends went to

Clark's house.  Crosby affirmed that he spoke to police when they arrived at Clark's house.  Photographs of Crosby's shoes and shoebox and Parker's speaker were received as exhibits.  Crosby testified that he had purchased his shoes on September 23, 2016, for $210.  In addition to the shoes, Crosby testified that he had $250 in cash and a $150 check from his workplace in his wallet at the time of the robbery.  Crosby only had his backpack, shoes, and phone returned to him by police.  Crosby testified that there was no "doubt in [his] mind" that the Defendant was the man who robbed him.

On cross-examination, Crosby testified that he thought there were "five or six dudes" sitting in the gold sedan prior to the robbery.  Only the Defendant and Copeland approached the court.  He affirmed that he and his mother looked on Facebook to try to identify the people who had robbed him.  Crosby remembered seeing the gold sedan drive past Clark's house following the robbery.  There were still "five or six" people in the gold sedan at that time.  Crosby affirmed seeing a second vehicle parked next to the gold sedan prior to the robbery.  On redirect examination, Crosby stated that he was "a hundred percent sure" that the Defendant was the man who "came up to [him], pointed a gun in [his] face, and demanded [his] property[.]"  Upon questioning by the court, Crosby explained that the Defendant took Clark's phone and phone charger directly from his person.  On both recross-examination and further redirect examination, Crosby reiterated that although he was focused on the gun that was pointed at him, he was still able to "focus" on the person who was holding the gun and "looked him in his eyes" when handing him his belongings.

Jaquese Clark's testimony largely mirrored that of Crosby and Willis.  Clark testified that on September 24, 2016, he was at his neighborhood basketball court with his friends after discovering that their local church court was closed.  Clark remembered seeing a gold Nissan Altima parked near the basketball court, with "a lot of people in the car and just sitting up there."  He explained that although it was not unusual for other people to watch people play basketball at the park, the people in the gold Nissan "didn't feel right" to him.  He elaborated that his "instincts were telling [him], like, something's up . . . people don't just sit in a car[.]"  Clark and his friends put their things on a bench by the court, and Parker, Willis, and Crosby began playing basketball, while Clark sat on the bench and watched.  Clark asked the occupants of the gold sedan if they were watching the basketball game, and the occupants of the car asked Clark if he and his friends were betting on the basketball game.  Clark told them that they were not betting on the game because he thought they were "trying to see if [they] had money[.]"  The Defendant and a "little short dude" began passing a gun back and forth to each other, and the Defendant, whom Clark described as the "leader" of the group, then approached the basketball court.  The Defendant threw his drink into a trashcan, turned around, and told Clark to "give me everything you got[.]"  The other man began "emptying everybody's pockets out[,]" and "they took everything that was on the bench[.]"

- 4 -

Clark testified that there were five people in the gold sedan. He had never seen the car or its occupants prior to the robbery. Clark specifically noticed the Defendant, who was driving the gold sedan, because he was "just looking at [them]." He described the Defendant's gun as "black and gray." Clark testified that Copeland also possessed a gun and was pointing it at them. After taking their possessions, the Defendant and Copeland returned to the gold sedan, with the Defendant again getting into the driver's seat. Following the robbery, Clark and his friends went to his home. They later saw the Defendant driving the gold sedan "a street over from [his] house." Though he was initially reluctant to talk to police for fear of being labeled a "snitch," Clark told police what had occurred during the robbery. Clark eventually got back his stolen phone.

On cross-examination, Clark testified that he and his friends first passed the gold sedan while walking towards the church, and he noticed "five or six" people inside of the sedan. Clark approximated that twenty minutes passed between the time they arrived at the basketball court and the robbery. The occupants of the gold sedan initially exited the car when they first began speaking to Clark. Clark was a "couple steps" from the Defendant by the end of their conversation. The Defendant was the same distance from Clark when he first pointed his gun at him. Clark affirmed that his mother was the person who called the police following the robbery.

Damarius Parker testified that he planned to meet with his friends to play basketball at their local church on September 24, 2016, but he discovered that the church was closed. He and his friends then went to play basketball at the outdoor court, and he noticed "five guys hanging out by one car," and they asked Parker and his friends if they were "betting anything on the game[.]" Parker and his friends began playing basketball, and the Defendant "came down the hill . . . with a bottle in his hand, threw it away, and pulled a gun out on [Crosby], and told [them] to . . . pull everything out of [their] pockets[.]" Copeland then "pulled out a gun as well[.]" Parker testified that his backpack, basketball shoes, speaker, and phone were taken during the robbery. Following the robbery, the Defendant, Copeland, and the other occupants of the gold sedan got back into the car and drove away. Parker testified that he was "terrified" during the robbery.

On cross-examination, Parker testified that he and his friends spoke to police approximately twenty minutes after the robbery occurred. He elaborated that the Defendant was approximately three feet away from him when he pointed his gun at Parker. Parker agreed that there were "three or four" other "kids that were at the playground" at the time of the robbery. Parker did not recall seeing the sedan again after the robbery. On redirect examination, Parker described the Defendant's clothing during the robbery as a tan bleached shirt and black pants.

Knoxville Police Department ("KPD") Officer James Erskine testified that he was working as a patrol officer on September 24, 2016, with his partner, KPD Officer Jacob Schettler. He estimated that no more than ten minutes passed between his being dispatched and making contact with two of the robbery victims. Officer Schettler contacted the other two victims. The victims described to Officer Erskine the men who robbed them as a "tall, heavyset, black male with kind of an afro-style hair, and . . . a lighter-skinned black male about six foot tall." The victims described their vehicle as a "newer model gold sedan that was all stock." Officer Erskine relayed those descriptions over his radio so that "other units in the area [could] be on the lookout[.]" After speaking with the victims, he and Officer Schettler contacted Investigator Thurman, and Officer Schettler "wrote out the initial report on the incident." The following day, Officer Erskine received a call from one of the victims, who told him that he had seen the gold sedan parked in front of a house near his home, and the men who had robbed him were sitting on the porch. The victim pointed out the two men who had robbed him, and Officer Erskine detained the two men, who were determined to be the Defendant and Copeland. Officer Erskine testified that as part of his detaining the two men, he patted them down and transported Copeland to be interviewed by Investigator Thurman. He found a loaded gun on Copeland when he patted him down, which he later placed into evidence. Officer Erskine described the gun that he removed from Copeland as "silver and black." He affirmed that the description given by the victims was consistent with the Defendant's and Copeland's appearance and the gold sedan. The gold sedan was a rental car, and its renter gave Officer Erskine permission to search the car. Inside the sedan, Officer Erskine found the Air Jordan sneakers and speaker that were reported as stolen property from the robbery.

On cross-examination, Officer Erskine clarified that he had interviewed Clark and Parker, and Officer Schettler interviewed Crosby and Willis. He agreed that the Defendant was one of the first people to speak to him when he first approached the porch, and the Defendant "was saying that he hadn't" been involved in the robbery. The Defendant did not have a weapon on his person when Officer Erskine patted him down. Officer Erskine affirmed that he had located bullets in the sedan when he searched it, and the bullets were the same caliber as the gun he found on Copeland's person.

On redirect examination, Officer Erskine testified that when he initially passed the house where the gold sedan was parked, all of the approximately eight men who were on the porch went inside the house, including the Defendant and Copeland. On recross-examination, Officer Erskine agreed that the Defendant was not the person to whom the gold sedan was rented. He did not recall whether the Defendant had any money on his person when he was arrested.

KPD Investigator Thomas Thurman testified that he worked in the violent crime unit since early 2015. He was on duty on September 24, 2016, and received a radio

notification about the occurrence of a robbery. He requested a detailed preliminary report so that he "could use it . . . in the coming days to try to follow up." Investigator Thurman had previously worked in Mechanicsville as a patrolman and described it as a "tight-kn[i]t community" with a "few hot spots that are problem areas." He elaborated that there are "a lot of good folks that live in Mechanicsville who are fearful of saying anything . . . when a crime happens next door." Investigator Thurman was "glad" that there were "young victims who were . . . interested in pushing the case." When Investigator Thurman arrived at the house where the gold sedan was parked on September 25, 2016, there were "a number of policemen" and "lots of neighbors" present at the scene. The Defendant and Copeland had already been placed in police cruisers, and "there were a handful of other individuals still present there near the front porch[.]" The gun that was found on Copeland's person was identified and entered into evidence. Investigator Thurman reiterated that one of the victim's shoes and speaker were located inside of the gold sedan.

At the scene, Investigator Thurman requested that the Defendant and Copeland be transported to police headquarters so that he could speak to them individually. He agreed that he advised the Defendant of his rights before interviewing him and that the Defendant understood his rights. The Defendant informed Investigator Thurman that he, Copeland, and his cousin, Tommy Lyons, had driven the gold sedan, which Lyons rented, to Mechanicsville from Chattanooga. Investigator Thurman affirmed that Lyons was also present at the house where the Defendant and Copeland were located.

On cross-examination, Investigator Thurman stated that it was "a little unusual" for victims in Mechanicsville to identify suspects to police in broad daylight. He agreed that the victims may have been more willing to identify the Defendant and Copeland because they "had never seen them" and "weren't familiar with them as being residents of Mechanicsville[.]" Investigator Thurman agreed that the gold sedan could potentially appear to be silver in color "depend[ing] on the lighting[.]" He further agreed that the bullets found in the gold sedan and the gun recovered from Copeland were both "in the nine-millimeter family[,]" but he was unsure whether the gun could actually fire those bullets because they were different brands. Investigator Thurman stated that a second firearm was not recovered inside of the home where the gold sedan was parked.

The Defendant elected not to testify on his own behalf. Following the close of proof, the jury found the Defendant guilty in all counts. In the second phase of the trial, the Defendant conceded that aggravated robbery was an enumerated criminal gang offense and that he was a criminal gang member at the time of the offenses. Following the close of evidence, the jury found that the Defendant's aggravated robbery of the four victims constituted criminal gang offenses. The jury found that the Defendant was a criminal gang member based upon the following criteria: the Defendant "[a]dmits to criminal gang involvements[;] the Defendant "[r]esides in or frequents a particular criminal gang's area,

adopts their style or dress, their use of hand signs or their tattoos, and associates with known criminal gang members[;] "the Defendant '[i]s identified as a criminal gang member[] by physical evidence such as photographs or other documentation." The jury also found that the aggravated robberies were committed at the direction of, in association with, or for the benefit of the Defendant's criminal gang or a member of the Defendant's criminal gang. At the sentencing hearing, the trial court applied the gang enhancement and elevated the Defendant's Class B aggravated robberies to Class A felonies, merged the 16 aggravated robbery convictions into four, and ordered the Defendant to serve concurrent 20-year sentences for each count. Following an unsuccessful motion for new trial, the Defendant filed a timely notice of appeal, and this case is now properly before us for review.

## ANALYSIS

**I. Sufficiency of the Evidence.** The Defendant contends that "there was insufficient proof from which the jury could have found that [the Defendant] could be convicted of the gang enhancement counts in the [i]ndictment[,]" specifically noting that "[t]he testimony of the State's witnesses about the purported benefit to Crips from [the] Defendant would not allow a rational trier of fact to do more than speculate about any purported benefit to Crips." He also asserts that the State failed to demonstrate sufficient evidence of a nexus "between the named members of the Crips and the listed convictions[.]" In response, the State argues the evidence sufficiently supported the gang enhancement counts because the Defendant committed the aggravated robberies with Jalon Copeland, a fellow gang member. Therefore, the gang enhancement applies because the aggravated robbery was committed "in association" with a fellow member of a gang. For the reasons that follow, we agree with the Defendant, and conclude that there was insufficient evidence to support application of the gang enhancements in this case.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As relevant to this appeal, the Criminal Gang Offenses Statute provides:

(a) As used in this section, unless the context otherwise requires:

(1) "Criminal gang" means a formal or informal ongoing organization, association or group consisting of three (3) or more persons that has:

(A) As one (1) of its primary activities, the commission of criminal gang offenses;

(B) Two (2) or more members who, individually or collectively, engage in or have engaged in a pattern of criminal gang activity;

(2) "Criminal gang member" is a person who is a member of a criminal gang, as defined in subdivision (a)(1), who meets two (2) or more of the following criteria:

(A) Admits to criminal gang involvement;
....
(D) Resides in or frequents a particular criminal gang's area, adopts their style or dress, their use of hand signs or their tattoos and associates with known criminal gang members;
....
(G) Is identified as a criminal gang member by physical evidence such as photographs or other documentation;

(3) "Criminal gang offense" means:

....

(B) The commission or attempted commission, facilitation of, solicitation of, or conspiracy to commit any of the following offenses on or after July 1, 2013:

....

(x) Aggravated robbery, as defined in § 39-13-402;

....

(4)(A) "Pattern of criminal gang activity" means prior convictions for the commission or attempted commission of, facilitation of, solicitation of, or conspiracy to commit:

(i) Two (2) or more criminal gang offenses that are classified as felonies; or
(ii) Three (3) or more criminal gang offenses that are classified as misdemeanors; or
(iii) One (1) or more criminal gang offenses that are classified as felonies and two (2) or more criminal gang offenses that are classified as misdemeanors; and
(iv) The criminal gang offenses are committed on separate occasions; and
(v) The criminal gang offenses are committed within a five-year period;

(B)(i) As used in this subsection (a), "prior conviction" means a criminal gang offense for which a criminal gang member was convicted prior to the commission  of the instant criminal gang offense by the defendant and includes convictions occurring prior to July 1, 1997;
(ii) Convictions for multiple criminal gang offenses committed as part of a single course of conduct within twenty-four (24) hours are not committed on "separate occasions." However, acts that constitute criminal gang offenses under subdivision (a)(3)(A) shall not be construed to be a single course of conduct.

(b) A criminal gang offense committed by a defendant shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed if:

(1) The defendant was a criminal gang member at the time of the offense; and

- 10 -

(2) The criminal gang offense was committed at the direction of, in association with, or for the benefit of the defendant's criminal gang or a member of the defendant's criminal gang.

Tenn. Code Ann. § 40-35-121(a)-(b)(1)-(2) (2016). The Defendant concedes, as he did at trial, that "he was a criminal gang member at the time" of the offenses and that aggravated robbery is an offense subject to enhancement by the criminal gang offense statute.

Finally, Tennessee Code Annotated section 40-35-121(g) provides

If the defendant is charged with a criminal gang offense and the district attorney general intends to seek enhancement of the punishment under subsection (b), (c) or (e), the indictment, in a separate count, shall specify, charge and give notice of the subsection under which enhancement is alleged applicable and of the required prior convictions constituting the gang's pattern of criminal gang activity.

During the gang enhancement phase of the trial, Stephanie Ogle, the officer supervisor with the Criminal Court Clerk's Office and the keeper of records for criminal convictions, identified fifteen (15) felony certified judgments of conviction for (1) Adrian Thomas (possession with intent to sell cocaine), (2) Devon Holloway (aggravated assault), (3) Gregory Chase Williamson (aggravated assault), (4) Jayshawn Edward Williams (aggravated burglary), (5) William Craig Wheat (attempted aggravated robbery and aggravated burglary), (6) Ronald Eugene Nelson, Jr., (robbery), (7) Lonnie Alvin McNair (possession with intent to sell cocaine), (8) Bekweri William Bost (possession with intent to sell cocaine), (9) James Edward Blance (facilitation to commit aggravated robbery), (10) James Coney (attempted possession with intent to sell cocaine), (11) Devonte Bonds (attempted second degree murder), (12) Thomas Bishop (attempted second degree murder), (13) Jason Sullivan (attempted second degree murder), (14) Nikos Burgins (aggravated rape, aggravated robbery, and especially aggravated kidnapping), and (15) Dominick Joseph Ratliff, (aggravated domestic assault). The judgments were received as a collective exhibit. All of the offenses had been committed within a five-year period. Ogle testified that whether the convictions were "enhanced for the criminal gang offense" was not listed on the judgments, and she was unsure whether "any of those enhancements were overturned later on[.]"

Detective Tom Walker of the Knox County Sherriff's Department testified that he worked in the gang intelligence unit. He was accepted by the court as an expert in gang identification and gang investigations. Detective Walker explained that in order for a person to be declared a gang member, he or she had to meet "ten points" on a Tennessee Gang Investigators checklist. Ways to "earn" points included nine points for "an admission

- 11 -

where they actually . . . say, 'Yes, I'm a gang member,'" two points for hand signs in photographs or on video that are specific to the gang they belong to, one point for wearing gang-specific colors in photographs or on video, two points for creating gang-specific graffiti to mark their territory, four points for associating with verified gang members, four points for felony criminal history, five points for committing violent acts, eight points for gang-specific tattoos, and six points for a weapons arrest. Once a person reached ten points, he or she was declared a gang member both "by the definition of the State of Tennessee" and "by the Tennessee Gang Investigators checkoff sheet." Detective Walker testified that "if there's a gang member in Chattanooga—because they are a state certified unit, they use the same criteria that [Knox County] do[es]." Detective Walker explained:

> [T]he Crips were a street gang that started . . . in the 1970[]s in LA. The Crips and the Bloods are . . . the main gangs that started somewhere other than New York and in Chicago. They started on the west coast in LA. They have multiple subsets. There are literally hundreds of them. . . . [I]f you want a—like an organizational chart, there are two nations. There's Folk Nation and People Nation.
>
> Folk Nation will be the Gangster Disciples and the Crip sets. People Nation will be your Bloods, Vice Lords, Latin Kings, Pirus, and stuff like that, and they will fall underneath the People Nation, and then under the umbrellas of the Crips or Gangster Disciples you have what's called the subsets. So, you know, and like I said, there's hundreds of them. Depending on where you are in the country, what state you're in, what city you're in, will depend on what subsets are in your particular area, and there's where our job comes in is to figure out what subsets of these gangs are in our area.

Detective Walker affirmed that all of the subsets still belonged to the same Crips. He stated there were eight different subsets in the Knoxville area alone, some of which did not get along with each other. Detective Walker identified all of the individuals named in the judgments of convictions from Ogle's testimony, with the exception of Ronald Eugene Nelson Jr., as confirmed Crip gang members with an excess of the requisite ten points. Detective Walker testified that the Defendant had been confirmed as a Crip gang member on December 16, 2016. To reach the requisite ten points, Detective Walker explained that the Defendant had given a statement that he was a gang member, posed for pictures on social media with him "throwing gang[-]specific hand signs [and] wearing gang[-]specific colors," associating and posing with known gang members in Chattanooga, had a felony criminal history, committed the aggravated robbery, a violent crime, and had also been confirmed as a Crip gang member by the Chattanooga Police Department's gang unit.

Photographs from the Defendant's Facebook page were received as exhibits. The photographs depicted the Defendant wearing a "blue do-rag," a gang-specific color, holding a handgun and threatening a rival gang, throwing a "W" gang sign for "west coast . . . where the 'Rollin 90s' are originally from[,]" and stepping on a red do-rag to demonstrate his "disrespect" for rival gangs. Further, the Defendant's Facebook page was under the name "Shun NHC," which Detective Walker identified as his street name and Neighborhood Crip, which "encompasses all Crips of a certain set or a particular area." The Defendant also spelled out "neighborhXCd" in one of his Facebook posts, which Detective Walker testified was symbolic for the "Rollin 90 Neighborhood" Crip gang. Another photograph from the Defendant's Facebook page depicted him at another Crip gang member's memorial in Chattanooga while doing the "Crip Stance" and "throwing the Rollin hand sign with both hands." In another photograph on the Defendant's Facebook page, he referred to a man in the photograph as "cuz," which Detective Walker explained was "a generic term for all Crips." Detective Walker reiterated that the Defendant had been confirmed as a gang member on December 16, 2016, when he was interviewed and admitted to being a "Rollin 90 Crip."

On cross-examination, Detective Walker testified that he was not present when the Defendant admitted to being a gang member. He explained that Officer Brent Worley, a member of the security threat group, interviewed the Defendant when he was initially admitted into the jail facility and subsequently generated an interdepartmental memo that Detective Walker reviewed and stored in his accumulated gang files. Detective Walker affirmed that with the exception of Nikos Burgins, a "107 Hoover," and Dominick Ratliff, a "plain Crip," all of the men in the judgments of convictions that were received by the court were confirmed members of the "52 Hoovers" gang, a subset of the Crips. He stated that all of those men "associate in the Mechanicsville area where the [robbery] took place." Detective Walker denied that the "Rollin 90s" Crips, to whom the Defendant belonged, had a "beef" with the "52 Hoovers." He explained that in 1979, the "Rollin 90s" Crips and the "111 Hoover" Crips had a "falling out." He further reiterated that the "Neighborhood Crips" was a term that encompassed all Crips subsets, so the Defendant could identify both as a "Neighborhood Crip" and a "Rollin 90s" Crip.

Investigator Thurman was recalled a witness. He identified photographs of Jalon Copeland wearing "a blue do-rag and a blue jacket and holding a silver-colored semi-automatic handgun."

Chattanooga Police Department ("CPD") Sergeant Josh May testified that he worked in gun and gang investigations. He explained that in 2015, CPD "started seeing a lot of social media activity" between the "Rollin 90 Crips" and the "Rollin 20 Bloods" gangs. The activity led to "shots fired and violence back and forth." Sergeant May stated that he first learned who the Defendant was when the Defendant was the victim of an

aggravated assault in March 2014. Copeland attended the same school as Sergeant May's children, and Sergeant May was asked by the principal to speak with Copeland regarding his "going down the wrong path." Sergeant May later came across Copeland's social media activity and "linked it to the 'Rollin 90' Crips." He also linked the Defendant's social media activity to the "Rollin 90" Crips. CPD utilized the same gang validation process as explained by Detective Walker. Sergeant May was able to confirm both Copeland and the Defendant as "Rollin 90" Crips members using such criteria. Sergeant May explained that he specifically used "videos on YouTube or Facebook live . . . with the individuals . . . claiming 'Rollin 90' Crip sets," "various social media pictures," "hand signs," and an admission by Copeland to classify them as "Rollin 90" Crips members. The Defendant and Copeland appeared together in videos and pictures on social media, along with other "Rollin 90s" Crips members. Sergeant May explained that there were only "10 to 11" "Rollin 90s" Crips members in Chattanooga, so CPD was able to "identify a vast majority of them[.]" Sergeant May agreed that there were a lot of Chattanooga gang members "coming up" to Knoxville, but he could not specifically link the "Rollin 90s" Crips as part of that migration. Sergeant May identified a photograph of Copeland with Trevion Peoples and Michael Knight, who were also known "Rollin 90" Crips members. Sergeant May further identified a photograph of a memorial for Jordan Clark, or "DarcSide[,]" who was killed in 2015 by a "Rollin 20 Blood" gang member.

On cross-examination, Sergeant May clarified that he did not have direct contact with the Defendant when he was the victim of a shooting in 2014. He was unaware that the Defendant was not in Chattanooga for a portion of 2015.

KPD Investigator Jacob Wilson testified that he was a patrolman in Mechanicsville in September 2016. He explained that he was one of the officers who responded to the house where the gold sedan, the Defendant, and Copeland were located on September 25, 2016. Subsequent to the Defendant's arrest, Investigator Wilson had been "dispatched either to that residence or the immediate area" multiple times. Investigator Wilson knew that the residence often housed "gang members, particularly Crips, from the Chattanooga area." He elaborated that he had been called to the house for "gunfire" and "known gang members sitting on the porch[.]" Investigator Wilson "noticed an uptick in known Crip gang members that are from the Chattanooga area" at the house and overall in Mechanicsville. On cross-examination, Investigator Wilson affirmed that the uptick in gang activity at that residence occurred after the Defendant's arrest and that there was no evidence that the Defendant was involved in that activity.

Viewed in the light most favorable to the State, we cannot conclude that the State sufficiently proved the gang enhancement counts based on the fatal variance between the indictment and the proof presented during the gang enhancement phase of trial. Tennessee Code Annotated section 40-35-121(g) mandates that the State "charge and give notice of

the subsection under which enhancement is alleged applicable and of the required prior convictions constituting the gang's pattern of criminal gang activity." In the instant case, the indictment charging the Defendant labeled him as a "Crips" member and listed eighteen other gang members as fellow "Crips" along with their past convictions to establish the necessary "pattern of criminal gang activity" as required by section 40-35-121(g). The Defendant was also listed as a plain "Crip." However, in the gang enhancement phase of trial, Detective Walker testified that with the exception of Nikos Burgins, a "107 Hoover," and Dominick Ratliff, a "plain Crip," all of the men in the judgments of convictions that were received by the court purportedly to establish a pattern of criminal gang activity were confirmed members of the "52 Hoovers" gang (Knoxville), a different subset of the umbrella Crips, who "associate[d] in the Mechanicsville area where the [robberies] took place." The Defendant was established as a "Rollin 90s" Crip member, a subset located only in Chattanooga. Such variance between the indictment and the evidence presented at trial is problematic in multiple ways.

A variance exists when the proof at trial does not correspond to the allegations in the indictment. State v. March, 293 S.W.3d 576, 588 (Tenn. Crim. App. 2008) (citing Keel, 882 S.W.2d at 416). A variance is not fatal unless it is material and prejudicial. State v. Moss, 662 S.W.2d 590, 592 (Tenn.1984); State v. Shropshire, 45 S.W.3d 64, 71 (Tenn. Crim. App. 2000); State v. Holloman, 835 S.W.2d 42, 45 (Tenn. Crim. App. 1992). "A material variance occurs only if the prosecutor has attempted to rely at the trial upon theories and evidence that were not fairly embraced in the allegations made in the indictment." State v. Mayes, 854 S.W.2d 638, 640 (Tenn. 1993) (citation omitted); State v. Ealey, 959 S.W.2d 605, 609 (Tenn. Crim. App. 1997). The Tennessee Supreme Court outlined the following test for determining whether a variance is prejudicial:

> Unless substantial rights of the defendant are affected by a variance, he has suffered no harm, and a variance does not prejudice the defendant's substantial rights (1) if the indictment sufficiently informs the defendant of the charges against him so that he may prepare his defense and not be misled or surprised at trial, and (2) if the variance is not such that it will present a danger that the defendant may be prosecuted a second time for the same offense; all other variances must be considered to be harmless error.

State v. Moss, 662 S.W.2d 590, 592 (Tenn.1984). Because the indictment in the instant case did not sufficiently inform the Defendant of the gang enhancement charges as required by statute, we cannot conclude that the indictment allowed the Defendant to prepare his defense without being misled or surprised at trial. The trial transcript shows that the State relied on evidence not fairly embraced in the gang enhancement portions of the indictment. In only labeling the men listed in the indictment to establish the notice of pattern of criminal gang activity required by the statute as plain "Crips" but using the subsets "52 Hoovers"

and a "107 Hoover" to establish the "pattern of criminal gang activity," the State limited the Defendant's ability to prepare a defense and potentially rebut such evidence of the pattern of criminal gang activity. We note that only one of the men, Dominick Ratliff, whose judgments of convictions were presented, were actually a "plain Crip" as the indictment purported all of the men listed to be. Such a change in evidence could have easily misled and surprised the Defendant at trial. Although we do not intend to state that the subset Crip groups do not fall under the umbrella Crips, the difference between being a "plain Crip" versus a member of a subset is evidenced by the fact that it is obviously possible to be only a "plain Crip" based on the information presented regarding Dominick Ratliff. The record suggests that the State intended to use the umbrella Crips to establish all of the requirements of section 40-35-121 as a work-around for establishing all of the needed parts of the enhancement statute when the Defendant was a member of a different gang than were the other gang members in the area. Concluding that such a variance was acceptable could create a dangerous precedent in allowing the State to give a defendant "notice" of gang enhancement based on the prior convictions of members of unrelated gangs to establish a "pattern of criminal gang activity" for the Defendant's gang.

We also note that even though Detective Walker explained that all of the subsets still belonged to the same Crips gang, the State failed to offer any proof that the Defendant's gang, the "Rollin 90s" Crips, had engaged in a "pattern of criminal gang activity." None of the victims, lifetime residents of Mechanicsville, had ever seen the Defendant prior to the instant offense. Additionally, Investigator Wilson candidly testified that "the uptick" in gang activity near the offense location occurred after the Defendant's arrest, and there was no evidence that the Defendant was involved in that activity. Only the Defendant and Copeland were presented as members of the "Rollin 90s" Crips. We do not mean to suggest that a subset of a criminal gang cannot satisfy the statutory definition required to establish a criminal gang or pattern of criminal gang activity or vice versa. Instead, we note only that the gang expert in this case did not offer any testimony connecting the umbrella branch of the Crips, the "52 Hoover" Crips, the "Hoover 107" Crips, or the "Rollin 90s" Crips, or specifically how the activities of these organizations interrelate.

Further, given that the gang enhancement counts obviously enhance a defendant's punishment for an enumerated crime, we liken the notice required by section 40-35-121(g) to the notice required by the State when it otherwise seeks enhanced punishment. See, e.g., Tenn. Code Ann. § 40-35-120(i)(2), § 40-35-202. In such an instance, the State's required notice is meant to provide "fair notice of their exposure to enhanced sentencing, orders plea-bargaining, enables defendants to make informed decisions before pleading guilty, aids defendants in developing trial strategy and preparing for sentencing hearings, and assists defendants 'in evaluating the risks and charting a course of action before trial.'" State v. Patterson, 538 S.W.3d 431, 438 (Tenn. 2017) (quoting State v. Adams, 788 S.W.2d

557, 559 (Tenn. 1990)) (internal footnote omitted). Thus, in labeling the Defendant and the other men listed in the indictment as "plain Crips" but actually proving them to be members of different gangs at trial, the State failed to provide the Defendant with proper and sufficient notice.

Because the State fail to provide sufficient notice to the Defendant, it also failed to prove that the Defendant's criminal act of stealing the victims' tennis shoes, money, and cell phones at gunpoint satisfied the conditions of section 40-35-121 to elevate the Defendant's conviction from a Class B to a Class A felony. We conclude, therefore, that the evidence is insufficient to support the jury's findings regarding the Criminal Gang Offenses Statute, and we vacate the judgments in Counts 13 through Count 16. The Defendant's underlying convictions for aggravated robbery remain intact and revert to Class B felonies in the absence of the gang enhancement.

At sentencing, the trial court engaged in extensive findings regarding the Defendant's criminal history and the respective enhancement and mitigating factors. The trial court specifically noted that its determination regarding the consecutive or concurrent nature of the Defendant's sentence would be impacted should the Defendant's convictions be reduced to Class B felonies on appeal. Accordingly, we remand to the trial court for resentencing. The Defendant also contends that the Criminal Gang Offenses Statute violates his constitutional rights to due process and expressive association. Because we have determined that the State presented insufficient evidence for the statute to be applied to the Defendant, consideration of this issue is not required for determination of the case. See, e.g., Watts v. Memphis Transit Management Co., 462 S.W.3d 495, 498 (Tenn. 1971); Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995); State v. Wilson, No. E2019-01864-CCA-R3-CD, 2021 WL 1227798, at *14 (Tenn. Crim. App. Mar. 31, 2021), perm. appeal denied (Aug. 6, 2021). Accordingly, we decline to address the constitutional questions raised by the Defendant in this appeal.

## CONCLUSION

Based upon the above reasoning and analysis, we reverse and vacate the judgments of conviction in counts 13 through 16 and remand for resentencing in this matter.

_____
CAMILLE R. MCMULLEN, JUDGE

- 17 -